IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EDSON T. MUSEMA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | Civil Action No. ADC-18-0158 |
| | * | |
| BALTIMORE CITY POLICE | * | |
| DEPARTMENT, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## **MEMORANDUM OPINION**

Defendant, Baltimore City Police Department ("Defendant"), moves this Court for summary judgment (the "Motion") (ECF No. 36). Defendant seeks a ruling from the Court that Plaintiff Edson T. Musema cannot prevail on his discrimination and hostile work environment claims because he cannot demonstrate the required elements of the claims. ECF No. 36-1 at 24–35. Plaintiff filed an opposition to Defendant's Motion (ECF No. 39) and Defendant replied (ECF No. 53). After considering the Motion and responses thereto, the Court finds that no hearing is necessary. *See* Loc.R. 105.6 (D.Md. 2018). In addition, having reviewed the pleadings of record and all competent and admissible evidence submitted by the parties, the Court finds that there is insufficient evidence from which a jury could find in Plaintiff's favor on the discrimination and hostile work environment claims. Accordingly, the Court will GRANT Defendant's Motion (ECF No. 36). Because this Court will grant Defendant's Motion, the other pending motions, Plaintiff's Motion for Leave to File a Sur-Reply Memorandum in Support of Opposition to Motion for Summary Judgment (ECF No. 57) and Defendant's Motion to Strike Plaintiff's Leave to File Sur-Reply (ECF No. 58), are DISMISSED as MOOT.

1

This lawsuit arises out of Plaintiff's allegations of discrimination based on race and national origin and hostile work environment against his current employer, the Baltimore City Police Department ("BPD"), in violation of Title VII of the Civil Rights Act. The facts are viewed in a light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Plaintiff, an African-American and native of the Democratic Republic of the Congo,[1] has been employed with the BPD since March 27, 2008 as a police officer. ECF No. 36-3 at 14, 16– 17, 22. Plaintiff's claims stem from a series of events involving Tashawna Gaines, a sergeant with the BPD, that allegedly occurred when Plaintiff was assigned to the North-East District in 2011, as well as from a BPD investigation into Plaintiff's use of force in an incident on March 6, 2014. ECF No. 39-1 at 2–6.

## A. Plaintiff's Assignment In The North-East District

Upon graduating from the BPD Police Academy in 2009 and completing his field training, Plaintiff was permanently assigned to the Patrol Division in the North-East District. ECF No. 36-3 at 23. At the time, Ms. Gaines was a sergeant in the North-East District. *Id.* at 25. Although Sgt. Gaines was never Plaintiff's direct supervisor, she would occasionally serve as "sergeant in charge" of the patrol shift when no lieutenant was on duty. *Id.* at 25–26. In April 2011, Plaintiff was dispatched to a call for a reported armed robbery. ECF No. 36-25 at 2–3. After responding to the call, Plaintiff was preparing to write his "Part I" report[2] when he was approached by Sgt.

---

[1] Plaintiff came to the United States in February 2000 as a political refugee. ECF No. 36-3 at 14, 20. He is a United States citizen and describes his race as "black." *Id.* at 16–17.

[2] A Part I report is a report on a serious crime, including crimes against persons and property. ECF No. 36-26 at 2.

Gaines, who began to "rush" Plaintiff to finish the report and threatened to "write [him] up" if the report was not completed within two hours. ECF No. 36-24 at 3–5. Per BPD policy, Part I reports are to be completed "within two hours of the completion of the call, unless extenuating circumstances exist" and officers are required to "[s]ubmit all reports without undue delay, but in any case before completion of the tour of duty." ECF No. 36-26 at 3. On April 13, 2011, Plaintiff submitted a letter to then-Deputy Major in the North-East District, Darryl DeSousa, about the incident, stating that he felt "intimidated" by Sgt. Gaines and that Sgt. Gaines must "stop rushing and harassing new young officers." ECF No. 36-24 at 4, 7. This letter also described a separate incident in which Sgt. Gaines allegedly "rushed" Plaintiff to finish another Part I report after a dispatch call in January 2011. *Id.* at 5–6.

Several months later, in July 2011, Plaintiff and Sgt. Gaines had a "verbal disagreement" regarding Plaintiff's use of leave. ECF No. 36-27 at 2. Plaintiff's wife, who was pregnant at the time, had been admitted to the hospital. *Id.* Plaintiff contacted the officer in charge to request leave in order to stay with his wife and his request was granted. *Id.* However, the officer in charge was then "overruled" by Sgt. Gaines, acting as "sergeant in charge," and Plaintiff was ordered to return to service or face disciplinary action. *Id.* Upon returning to service, Plaintiff encountered another sergeant, who instructed Plaintiff to stay at the hospital with his wife and return to service at 5:00 AM. *Id.* Sgt. Gaines later discovered Plaintiff had "disobeyed her decisions." ECF No. 36-3 at 30. On another occasion, Plaintiff was present for roll call when Sgt. Gaines allegedly looked in Plaintiff's direction in an "open area at Northeastern District" and stated, "I don't understand these people." ECF No. 36-27 at 2; ECF No. 36-3 at 76–78. Plaintiff understood this remark to refer to non-native born Americans. *See* ECF No. 36-3 at 43–44. Plaintiff detailed both

of these incidents in a report to Major Marc Partee dated March 31, 2015, when he was assigned to the Patrol Division in the North-West District. ECF No. 36-27 at 2–3.

Based on the events described, Plaintiff requested a transfer from the North-East District in 2011. ECF No. 36-3 at 84. His transfer request was granted, and he was then assigned to the North-West District. *Id.*

## B. March 6, 2014 Incident And Resulting BPD Investigation

On March 6, 2014, Plaintiff was on day shift in the North-West District. *Id.* at 89. Plaintiff was at the North-West repair station waiting for his police vehicle to be repaired when a call came through for a reported stolen vehicle in progress. *Id.* at 89–92. Another North-West District officer, Fabien Milord, was present at the repair station when the call came in, and Plaintiff asked Officer Milord if they could use his vehicle to respond to the call as Plaintiff's vehicle was out of service. *Id.* at 90–92. Officer Milord agreed, and Plaintiff got into the front passenger seat of the vehicle. *Id.* at 93–94. Officer Milord and Plaintiff began pursuit and were then joined by Officers Jukam and Cohen in another police vehicle. *Id.* at 94. Officers Jukam and Cohen were able to stop the stolen vehicle, but the driver of the stolen vehicle drove off, which initiated a high-speed chase. *Id.* at 94–95.

Officer Milord and Plaintiff pursued the stolen vehicle at a high rate of speed. *Id.* at 95. The stolen vehicle traveled north towards Baltimore County at which time the supervising lieutenant, George Hauf, ordered Officer Milord and Plaintiff to break off the pursuit. *Id.* at 96. However, Officer Milord and Plaintiff continued pursuit and observed the stolen vehicle make a turn to stay within city limits. *Id.* Due to the high rate of speed, Lieutenant Hauf again ordered Officer Milord and Plaintiff to break off the chase and repeated the order "four times." *Id.* At that time, Officer Milord turned off the police lights and siren, but the pair continued to pursue the

4

stolen vehicle. *Id.* at 96–97. An officer on the radio reported that the stolen vehicle had become caught in heavy rush hour traffic, and Lieutenant Hauf then permitted Officer Milord and Plaintiff to pick up pursuit if the vehicle was still in their sights. *Id.* at 97. Officer Milord reactivated the police lights and siren, and the pair caught up to the stolen vehicle. *Id.* at 97–98. As Officer Milord and Plaintiff approached the stolen vehicle, the suspect put the vehicle in reverse and accelerated towards the police vehicle. *Id.* at 98. Officer Milord and Plaintiff jumped out of the police vehicle before the collision, and Plaintiff drew his service weapon. *Id.* Plaintiff looked around for Officer Milord but did not see him and feared that Officer Milord had gotten caught under the stolen vehicle during the collision. *Id.* at 99–100. Plaintiff then pointed his weapon at the suspect's head, shouted at the suspect to stop, and fired his weapon into the right side of the stolen vehicle at the suspect. *Id.* at 99–101. Shortly thereafter, Officers Jukam and Cohen arrived at the scene and secured the suspect. *Id.* at 101–02.

Pursuant to BPD policy, any discharge of a firearm by an officer must be reported and investigated. ECF No. 36-4 at 2. At the time of this incident, the unit that conducted use of force investigations was called the Force Investigation Team ("FIT"). ECF No. 36-3 at 105. This unit had recently been formed and taken over police-involved shooting investigations from the homicide unit. *Id.* at 126. At the time, FIT was commanded by Colonel Garnell Green and consisted of Lieutenant Michael Norris, Sgt. Tashawna Gaines, and Detective Charles Anderson, as well as other detectives. ECF No. 36-5 at 8–9. FIT investigations consist of two stages: (1) FIT conducts an initial investigation and forwards the results to the Baltimore City State's Attorney's Office to determine whether criminal charges will be brought; and (2) if the State's Attorney's Office declines to bring charges, FIT conducts further investigation to determine if any BPD policies have been violated. *Id.* at 15–16. FIT's findings in the second investigation are

presented to the Categorical Use of Force Review Board, which reviews an incident for compliance with BPD policies. *Id.* at 23–25; ECF No. 36-6 at 2, ¶ 6.

On March 6, 2014, the FIT unit responded to the scene to conduct the initial investigation. ECF No. 36-5 at 9. The results of that investigation were then sent to the Baltimore City State's Attorney's Office, which determined that there was insufficient evidence to pursue criminal charges in a letter dated July 11, 2014. ECF No. 36-8 at 2. Plaintiff was then ordered to appear at the Office of Internal Oversight to provide a statement on July 24, 2014. ECF No. 36-9 at 2. Plaintiff attended the hearing with counsel and was examined by Detective Anderson. ECF No. 36-3 at 110.

Around July or August 2014, Plaintiff received a conditional offer for employment with the Louisville Police Department in Louisville, Kentucky. *Id.* at 106–07. The Louisville Police Department contacted the BPD regarding Plaintiff's application and learned Plaintiff was under investigation for the March 6, 2014 incident. *Id.* at 121–22. Thereafter, in August 2014, Plaintiff contacted Detective Anderson to inquire about the status of the investigation and stated that he was going to file an Equal Employment Opportunity Commission ("EEOC") complaint against Sgt. Gaines because "she [wa]s the reason why his case [wa]s still open." ECF No. 36-7 at 2, ¶ 6; ECF No. 36-10 at 2. Plaintiff's commanding officer, Major Marc Partee, learned of the contact and ordered Plaintiff not to personally contact the FIT detectives. ECF No. 36-11 at 2; ECF No. 36-12 at 2. In October 2014, Plaintiff then began making internal complaints about the length and pace of the ongoing investigation. ECF No. 36-13 at 2–3. At some time in 2014, Plaintiff also sat for the written sergeant examination, in which he was unsuccessful. ECF No. 36-3 at 192–94.

On November 5, 2014, Detective Anderson presented FIT's investigation findings to the Categorical Use of Force Review Board. ECF No. 36-6 at 2, ¶ 7; ECF No. 36-7 at 3, ¶ 10; ECF

6

No. 36-15 at 2. The Board concluded that Plaintiff's tactics and use of force during the March 6, 2014 incident violated BPD policy. ECF No. 36-15 at 2. The Board also found policy violations for Officer Milord. *Id.* at 3. Specifically, the Board found that "[Plaintiff] did not follow pursuit procedures, as he was told to break-off the pursuit by Lt. Hauf based on the speed of the fleeing vehicle. Not only did [Plaintiff] continue the pursuit, he did so without using emergency lighting, which is against policy." ECF No. 36-16 at 2. Additionally, the Board found that "[Plaintiff] shot at a moving vehicle, which is against policy." *Id.* at 3.

After the Board issued its findings, Detective Anderson submitted a final report, dated December 16, 2014, and forwarded it to the BPD Internal Affairs for review. ECF No. 36-7 at 3, ¶ 12; ECF No. 36-17. Internal Affairs then reviewed the findings to determine whether disciplinary charges should be recommended to the Disciplinary Review Committee. *See* ECF No. 36-6 at 3, ¶ 10. On March 29, 2015, the Disciplinary Review Committee issued disciplinary charges against Plaintiff, including "fail[ing] to ensure that a vehicle pursuit was terminated after being ordered by Lieutenant George Huff [sic] to do so," and "exercis[ing] poor tactics and/or judgment in the use of deadly force." ECF No. 36-18 at 2–3. According to the BPD Disciplinary Matrix,[3] violations relating to failure to obey an order are classified as "E" violations, and violations involving excessive force are classified as either "E" or "F" violations. ECF No. 36-19. Penalties recommended for "E" violations include any or all of the following: over fifteen days of loss of leave; a severe letter of reprimand; over fifteen days suspension; demotion; involuntary transfer when continued presence of the member would impact the unit's performance; and dismissal. *Id.* at 4. The only recommended penalty for an "F" violation is dismissal. *Id.* The Disciplinary

---

[3] The BPD Disciplinary Matrix "establish[es] a standardized recommendation process for discipline" and "ensure[s] that disciplinary recommendations are fundamentally fair and applied uniformly." ECF No. 36-19 at 2.

Review Committee recommended that Plaintiff be terminated. ECF No. 36-18 at 7. Then-Deputy Commissioner Jeronimo Rodriguez approved the charging documents and termination recommendation. ECF No. 36-6 at 3, ¶ 11; ECF No. 36-18 at 5.

On March 31, 2015, Plaintiff's police powers were suspended temporarily, although he continued to work with pay.[4] ECF No. 36-20 at 2. Pursuant to section 3-101 of the Public Safety Article of the Maryland Code, Plaintiff exercised his right to an administrative board hearing. ECF No. 36-18 at 6. The hearing was held on April 8, 2015, to review the suspension of Plaintiff's police powers. ECF No. 36-21 at 2. After conducting the hearing, then-Colonel Darryl DeSousa upheld the decision to suspend Plaintiff's police powers with pay pursuant to protocol. *Id.* at 3.

Prior to the final determination on the disciplinary charges, then-Deputy Commissioner Rodriguez retired and Colonel DeSousa was promoted to serve as Deputy Commissioner, which included supervising and settling disciplinary matters. ECF No. 36-6 at 3, ¶ 14. On August 20, 2015, Deputy Commissioner DeSousa dismissed the charges against Plaintiff and instead ordered that he complete training in high risk vehicle stops, the same training the Categorical Use of Force Review Board recommended for the other officers involved in the March 6, 2014 incident. ECF No. 36-22 at 2; ECF No. 36-16 at 2. After initially refusing to sign the paperwork for dismissal of charges, ECF No. 36-3 at 185–86, Plaintiff completed the paperwork and training, and his police powers were reinstated on February 24, 2016, ECF No. 36-23 at 2.

---

[4] On the same day, Plaintiff submitted a report to Major Marc Partee accusing Sgt. Gaines of harassment and employment discrimination and blaming her for, *inter alia*, the length and pace of the investigation, his suspension, and the disciplinary charges filed against him. ECF No. 36-27 at 2–3.

## PROCEDURAL BACKGROUND

On July 22, 2015, Plaintiff filed a Charge of Discrimination against the BPD with the Baltimore Community Relations Commission and the EEOC, alleging continuing racial and national origin discrimination. ECF No. 36-31 at 2. In the charge, Plaintiff attributed the "false[] accus[ations] of misconduct" following the March 6, 2014 incident, his suspension, and recommended termination to Sgt. Gaines and her alleged bias towards "non-Americans." *Id.* Plaintiff filed a second Charge of Discrimination with the Baltimore Community Relations Commission and the EEOC on December 23, 2015, alleging racial and national origin discrimination and retaliation dating from March 31, 2015 through December 23, 2015. ECF No. 36-32 at 2. Specifically, Plaintiff stated that he was "forced to sign paperwork for the dismissal of the charges," was required to attend training on high risk vehicle stops, and did not have his police powers reinstated in a timely fashion after his disciplinary charges were dismissed on August 18, 2015. *Id.* at 2–3. Plaintiff compared his experience to an unrelated incident in which three BPD officers were investigated for their involvement in a high-speed chase that resulted in civilian fatalities and purportedly had their police powers reinstated two weeks after being cleared of charges. *Id.* at 3. On September 1, 2017, the United States Department of Justice issued a right-to-sue letter.[5] ECF No. 36-1 at 19.

On January 18, 2018, after exhausting his administrative remedies, Plaintiff filed suit in this Court against Defendant alleging that he suffered race and national original discrimination and

[5] The Court notes that neither Plaintiff nor Defendant has produced the Notice of Right to Sue. Defendant states that the notice was issued on September 1, 2017 but only cites a letter from the EEOC dated June 21, 2017 informing Plaintiff that his Notice of Right to Sue must be issued by the Department of Justice. ECF No. 36-33 at 2–3.

hostile work environment in his employment with the BPD. ECF No. 2.[6]

On September 7, 2018, Defendant filed its Motion seeking summary judgment against Plaintiff for his claims of race and national origin discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964. ECF No. 36. On October 22, 2018, Plaintiff filed an opposition. ECF No. 39.[7] Defendant filed a reply on January 4, 2019. ECF No. 53.[8]

This matter is now fully briefed, and the Court has reviewed Defendant's Motion as well as the responses thereto. For the following reasons and pursuant to Federal Rule of Civil Procedure 56(a), Defendant's Motion (ECF No. 36) is GRANTED.

## DISCUSSION

### A. Standard of Review

Pursuant to Rule 56, a movant is entitled to summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Supreme Court has clarified that not every factual dispute will defeat a motion for summary judgment but rather, there must be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere

[6] On March 29, 2018, in accordance with 28 U.S.C. § 636 and Local Rules 301 and 302 of the United States District Court for the District of Maryland and upon consent of the parties, this case was transferred to United States Magistrate Judge A. David Copperthite for all proceedings. ECF No. 19.

[7] On December 20, 2018, nearly two months after filing his initial response, Plaintiff filed a "corrected" opposition. ECF No. 48. This response was stricken as untimely pursuant to Local Rule 105.2 and without leave of Court. ECF No. 54. Plaintiff then filed a motion for leave to file a sur-reply or an amended response on January 17, 2019. ECF No. 57. Plaintiff seeks to correct his initial opposition because it inadvertently failed to oppose summary judgment on the hostile work environment claim. *Id.* at 1.

[8] Defendant initially filed its reply on December 5, 2018, ECF No. 46, in accordance with an order granting the parties' joint motion to extend filing deadlines, ECF No. 38. However, this reply was filed in error. Defendant did not re-file the reply until January 4, 2019. ECF No. 53.

10

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphases in original)). An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome. *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). On the other hand, if after the court has drawn all reasonable inferences in favor of the nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

The party seeking summary judgment bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met its burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. In order to meet this burden, the non-movant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed.R.Civ.P. 56(e)).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Anderson*, 477 U.S. at 249). Thus,

"to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Moss v. Parks Corp.*, 985 F.2d 736, 738 (4th Cir. 1993) (quoting *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990)).

## B. Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment because Plaintiff has failed to establish a *prima facie* case for his discrimination and hostile work environment claims. Specifically, regarding the discrimination claims, Defendant contends that Plaintiff is unable to demonstrate any direct or indirect evidence of discrimination and is also unable to meet the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). ECF No. 36-1 at 23–27. Additionally, Defendant contends that there was a legitimate, non-retaliatory reason for its actions. *Id.* at 30–31. Regarding the hostile work environment claim, Defendant contends that Plaintiff cannot prove that he was subject to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Id.* at 27 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015)) (internal quotation marks omitted).

1. Defendant Is Entitled To Summary Judgment As To The Discrimination Claims.

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1) (2018). Plaintiffs may prove discrimination through "two 'avenues of proof'": (1) direct or indirect evidence, or (2) the burden-shifting framework of *McDonnell Douglas*. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc)). "It is left to the plaintiff's

12

discretion whether to proceed by direct and indirect evidence or by mean of the *McDonnell Douglas* burden-shifting framework." *Id.* (citing *Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 318 n.4 (4th Cir. 2005)).

    a. Plaintiff Is Unable To Establish Any Direct Or Indirect Evidence Sufficient To Support A Finding Of Race Or National Origin Discrimination.

A plaintiff seeking to use direct or indirect evidence to establish discrimination must present evidence that "both display[s] a 'discriminatory attitude' and bear[s] a causal relationship with the adverse employment action." *Ousley v. McDonald,* 648 F.App'x 346, 349 (4th Cir. 2016) (quoting *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 520 (4th Cir. 2006)). "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Warch,* 435 F.3d at 520 (citing *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 608 (4th Cir. 1999)).

Here, Plaintiff is unable to point to any direct or indirect evidence linking the alleged discriminatory statements and actions of Sgt. Gaines in 2011 to the adverse employment actions allegedly suffered after the March 6, 2014 shooting incident. Plaintiff points to several events to show Sgt. Gaines's discriminatory attitude. First, Plaintiff references the July 2011 incident in which Sgt. Gaines ordered Plaintiff to leave the hospital where his wife had been admitted and return to service. ECF No. 2 at 3, ¶ 14. Second, Plaintiff cites the occasion in which Sgt. Gaines glanced in Plaintiff's direction in an open area and allegedly said, "I don't understand these people." *Id.* at 6, ¶ 31. Finally, Plaintiff refers to the FIT investigation following the March 6, 2014 incident and emphasizes the fact that Sgt. Gaines supervised the investigation. *Id.* at 4, ¶¶ 18–19. Plaintiff then contends that he suffered several adverse employment actions: (1) investigation into his conduct during the March 6, 2014 incident; (2) delay of the investigation, which impacted his ability to accept employment with the Louisville Police Department; (3)

suspension of his police powers; and (4) disqualification for promotion to sergeant. *Id.* at 7, ¶ 40; ECF No. 39-1 at 13–14.

The evidence is insufficient to suggest that race or national origin was a motivating factor in the investigation, suspension, or disqualification for promotion to sergeant. *Ousley*, 648 F.App'x at 349. The only incident which reflects any potentially discriminatory attitude is Sgt. Gaines's alleged comment, "I don't understand these people," and even when viewing that evidence in a light most favorable to Plaintiff, the comment is "isolated" and has no demonstrable relation to the investigation or suspension that occurred nearly three years later. *Warch*, 435 F.3d at 520 (finding that the plaintiff presented no evidence to show that a comment relating to age "was more than an isolated event or that it had any nexus with the decision to terminate him"). Similarly, the July 2011 incident "reflects little, if any, 'discriminatory attitude'" towards Plaintiff's race or national origin. *Ousley*, 648 F.App'x at 349. And, contrary to Plaintiff's assertion, the evidence clearly indicates that the investigation occurred pursuant to BPD policy to investigate all uses of force and Sgt. Gaines's role in the investigation was minor. ECF No. 36-4 at 2; ECF No. 36-7 at 2–3, ¶¶ 4–13. Consequently, Plaintiff has not put forth sufficient direct or indirect evidence to create a genuine issue of material fact upon which a reasonable jury could find discrimination.

> b. Plaintiff Cannot Establish Discrimination Under The *McDonnell Douglas* Burden-Shifting Framework.

A claim of discrimination may also be analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). Under that framework, a plaintiff can establish a *prima facie* case of discrimination by showing that:

14

> (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class.

*Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). If the plaintiff states a *prima facie* case of discrimination, "the burden shifts to the [defendant] to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (quoting *Hill*, 354 F.2d at 284) (internal quotation marks omitted). If the defendant makes such a showing, the burden then shifts back to the plaintiff to "prove by a preponderance of the evidence that the [defendant]'s stated reasons were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Hill*, 354 F.2d at 285) (internal quotation marks omitted).

There is no question that Plaintiff, as an African-American male and native of the Democratic Republic of the Congo, is a member of a protected class. Plaintiff has also presented evidence that his performance evaluations were satisfactory, with overall evaluations ranging from "average" to "excellent" between 2012 and 2016. ECF No. 42-5. Defendant challenges, however, whether based on the factual record construed in a light most favorable to Plaintiff, Plaintiff has been subjected to adverse employment action and the circumstances give rise to an inference of unlawful discrimination. ECF No. 36-1 at 24–27, 28–30.

"To prevail on a Title VII claim, 'the existence of some adverse employment action is required.'" *Holland*, 487 F.3d at 219 (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Westmoreland v. Prince George's Cty., Md.*, 876 F.Supp.2d 594, 604–05 (D.Md. 2012) (citations and internal quotation marks omitted). "[A]lthough actions short of termination may constitute an adverse employment

15

action within the meaning of [Title VII] . . . not everything that makes an employee unhappy is an actionable adverse action." *Settle v. Balt. Cty.*, 34 F.Supp.2d 969, 989 (D.Md. 1999) (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997)) (internal quotation marks omitted).

As noted, Plaintiff argues that he suffered several adverse employment actions: (1) the investigation resulting from his conduct on March 6, 2014; (2) the nature and length of the investigation, which ultimately prevented Plaintiff from gaining employment with the Louisville Police Department and which has created a "blemish on his record"; (3) the suspension of his police powers on March 31, 2015; and (4) disqualification for promotion to sergeant in the BPD. ECF No. 2 at 7, ¶ 40; ECF No. 39-1 at 13–14. The Court will address each alleged adverse action.

Plaintiff's first two allegations of adverse employment action relate to the investigation conducted after the March 6, 2014 shooting incident. In *Settle v. Baltimore County*, similar to the instant case, this Court considered the plaintiffs' allegation that a disciplinary investigation was conducted disparately. 34 F.Supp.2d at 992. The Court stated:

> [P]laintiffs have to show not only that the disciplinary proceedings sprang from a discriminatory or retaliatory motive, but that the nature and character of the investigation . . . actually adversely affected some term or condition of employment . . . . Specifically, if a disciplinary investigation is reasonably rooted in articulable facts justifying such an investigation, neither inconvenience nor emotional anxiety on the employee's part will constitute an "employment injury" sufficient to render the investigation itself an adverse employment action independently cognizable under Title VII.

*Id.*

In this case, the evidence is clear that the investigation into the March 6, 2014 incident and the resulting disciplinary proceedings did not spring from a discriminatory motive based on Plaintiff's race or national origin. The investigation arose in accordance with BPD policy to

16

investigate all uses of force. ECF No. 36-4 at 2. Throughout the investigation until March 31, 2015, Plaintiff continued to work as a police officer and be paid. ECF No. 36-3 at 159–61. Plaintiff argues that the length of the investigation affected his ability to gain employment with another police department, but there is no evidence that the investigation was intentionally prolonged by Sgt. Gaines or any of the members of the FIT unit. In fact, Detective Anderson, the lead detective, testified that "Sgt. Gaines was not directly involved in the investigation" and that she "did not delay the investigation in any way." ECF No. 36-7 at 3, ¶¶ 8–9. Notably, Detective Anderson, not Sgt. Gaines, presented the investigation findings to the Categorical Use of Force Review Board and authored the final report after the Board found Plaintiff's conduct violated BPD policy. *Id.* at ¶¶ 10, 12; ECF No. 36-17. Furthermore, Plaintiff acknowledged in his deposition that, at the time, the FIT unit was new and that his case was one of the first the unit investigated. ECF No. 36-3 at 126. Thus, the evidence demonstrates that the nature and character of the investigation was not unreasonable and was not motivated by Plaintiff's race or national origin. Rather, the investigation was "reasonably rooted in articulable facts justifying [it]," so the "inconvenience" Plaintiff experienced in being unable to start employment elsewhere is insufficient to qualify as an adverse employment action according to *Settle*. 34 F.Supp.2d at 992.

Plaintiff also argues that the suspension of his police powers on March 31, 2015 was an adverse employment action. "Title VII liability can arise from a tangible employment action," which includes "hiring, firing, failing to promote, . . . [and] reassignment with significantly different responsibilities." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (internal quotation marks omitted). "[H]owever, . . . reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." *Id.* "[A]bsent any decrease in

17

compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action." *Id.* at 256–57. Here, it is undisputed that Plaintiff continued to work as a police officer after March 31, 2015, even if in a "non-enforcement" capacity, and continued to be paid. ECF No. 36-3 at 159–61. It is also noteworthy that suspension was standard BPD procedure in cases where termination had been recommended. ECF No. 36-21 at 3. As discussed more fully below, Plaintiff was not eligible for promotion at the time as he had failed the written sergeant examination. ECF No. 36-3 at 191–92. Once Plaintiff completed the required high-risk vehicle stop training, his police powers were restored, and he returned to active duty. *Id.* at 190–91. Thus, the suspension of Plaintiff's police powers does not constitute an adverse employment action as he did not experience a decrease in compensation, job title, or opportunity for promotion.

Finally, Plaintiff argues that the investigation disqualified him for promotion to sergeant within the BPD and that the disqualification was an adverse employment action. As noted, a decrease in opportunity for promotion constitutes an adverse employment action. *Boone*, 178 F.3d at 256–57. However, to prove failure to promote, a plaintiff must show that he is qualified for promotion. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994). Despite attributing the failure to promote to the "prolonged investigation," Plaintiff admitted that he had failed the written sergeant examination. ECF No. 36-3 at 191–92. Therefore, Defendant's failure to promote Plaintiff did not constitute an adverse employment action.

Even if Plaintiff could establish adverse employment action, he is unable to show that the circumstances surrounding the alleged discriminatory conduct raise an inference of unlawful discrimination. In addition to proving that he is a member of a protected class, suffered adverse employment action, and had satisfactory job performance, Plaintiff must show that "similarly

situated employees outside [his] class received more favorable treatment." *Settle*, 34 F.Supp.2d at 991. Plaintiff alleges that three events give rise to an inference of unlawful discrimination: (1) the July 2011 hospital incident; (2) Sgt. Gaines's alleged comment, "I don't understand these people"; and (3) the investigation. ECF No. 39-1 at 15.

"Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim." *Haywood v. Locke*, 387 F.App'x 355, 359 (4th Cir. 2010) (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)). But, when a plaintiff bases his allegations on a comparison to an employee from a non-protected class, he must "show that [he is] similar in all relevant respects to [the] comparator." *Id.* "Such a showing would include evidence that the employees 'dealt with the same supervisor, were subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

With regard to the investigation, Plaintiff argues that he was similarly situated to two officers involved in the March 6, 2014 incident: Officers Elliot Cohen and Jason Jukam. While Officers Cohen and Jukam "were able to move forward with their training timely . . . and avoid a prolonged investigation," Plaintiff alleges that he was disparately treated when he suffered a "discriminatory delay" in his investigation and ultimate resolution. ECF No. 39-1 at 15. However, it is undisputed that Plaintiff engaged in substantially different conduct on March 6, 2014 than Officers Cohen and Jukam did, rendering them inadequate comparators. Officers Cohen and Jukam were in a separate police vehicle and made the initial stop of the stolen vehicle, but they did not participate in the continuation of the pursuit against Lieutenant Hauf's orders and they were not present when the actual stop was made. ECF No. 36-3 at 94–101. Most importantly,

Officers Cohen and Jukam did not fire their service weapons into the stolen vehicle, as Plaintiff did. *Id.* Plaintiff's use of force, rather than his race or national origin, was the sole reason the investigation occurred, and the investigation does not give rise to an inference of unlawful discrimination because Plaintiff was not similarly situated to Officers Cohen or Jukam.

Similarly, Plaintiff's arguments regarding the July 2011 incident and Sgt. Gaines's alleged comment fail to give rise to an inference of unlawful discrimination. In the July 2011 incident, Sgt. Gaines merely ordered Plaintiff to return to service as scheduled. *Id.* at 66–69. As to the alleged comment, Sgt. Gaines's remark was made "one time" "in an open area" in the North-East District where a number of officers were gathered after roll-call. *Id.* at 76–78; ECF No. 36-27 at 2–3. Both of these incidents were isolated and have no demonstrable relation to the adverse actions Plaintiff claims to have endured.

Assuming *arguendo* that Plaintiff has established a *prima facie* case of discrimination, the burden shifts to Defendant to show that it had legitimate, nondiscriminatory reasons for its actions. This is a burden of production, not persuasion, meaning that Defendant merely must provide evidence demonstrating that the investigation, resulting suspension, and failure to promote were not based on Plaintiff's race and/or national origin. *See Holland*, 487 F.3d at 214. Defendant easily carries this burden because it produced evidence showing that Plaintiff's investigation was triggered pursuant to BPD policy when any use of force occurs, and the investigation was lengthy because the process requires multiple stages of investigation and review. ECF No. 36-4; ECF No. 36-5 at 14–16, 23–25; ECF No. 36-6 at 3, ¶¶ 9–11. Defendant also produced evidence showing that Plaintiff was charged with disciplinary violations and recommended for termination because authorities at multiple levels of review, from the Categorical Use of Force Review Board, the Disciplinary Review Committee, and then-Deputy Commissioner Rodriguez, determined that his

20

conduct violated several BPD policies. ECF Nos. 36-6, 36-15, 36-18. Finally, Defendant produced evidence demonstrating that Plaintiff's suspension was standard BPD procedure in cases where termination was recommended, ECF No. 36-21 at 3, and that Plaintiff was not promoted to sergeant because he failed the written sergeant examination, ECF No. 36-3 at 191–93.

Because Defendant has carried the burden of producing evidence of legitimate-nondiscriminatory reasons for its actions, the burden shifts to Plaintiff to show that Defendant's explanations are pretextual. As a practical matter, the burden to show pretext "merge[s] with the ultimate burden of persuading the court" that the plaintiff has been the victim of unlawful discrimination, which Plaintiff can accomplish by showing that Defendant's proffered explanation is "unworthy of credence." *Holland*, 487 F.3d at 214 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Here, Plaintiff has put forth insufficient evidence showing that Defendant's proffered legitimate explanations were false. Plaintiff makes a "cat's paw liability" argument, essentially arguing that Sgt. Gaines exerted influence over the investigation and decision-making process. ECF No. 39-1 at 19–21. However, Plaintiff does not point to any specific instance in which Sgt. Gaines delayed the investigation or had any influence over material decisions. The evidence is uncontroverted that Detective Anderson was the lead investigator on Plaintiff's case and that, although Sgt. Gaines was his supervisor, she did not delay the investigation in any way. ECF No. 36-7 at 2–3, ¶¶ 7–9. It is also uncontroverted that decision-making power rested with the Categorical Use of Force Review Board to determine whether policy violations occurred, the Disciplinary Review Committee to determine charges and sanctions, and the Deputy Commissioner to approve charges. ECF No. 36-6 at 2–3, ¶¶ 7–11; ECF No. 36-15; ECF No. 36-18. Such evidence refutes Plaintiff's cat's paw liability theory as this theory requires the supervisor

21

to be "principally responsible for, or the actual decisionmaker behind, the action." *Chang Lim v. Azar*, 310 F.Supp.3d 588, 602 (D.Md. 2018) (citations and internal quotation marks omitted). Here, it is clear that Sgt. Gaines was neither principally responsible for nor the actual decisionmaker behind the alleged adverse employment actions. For these reasons and based on the evidence in the record, no reasonable jury could conclude that Defendant's proffered explanation is "unworthy of credence." *Burdine*, 450 U.S. at 256.

Therefore, because Defendant has put forth evidence of a legitimate, nondiscriminatory basis for investigating, suspending, and declining to promote Plaintiff and Plaintiff has failed to present any evidence sufficient to refute it or otherwise establish a genuine issue of material fact, Defendant is entitled to judgment as a matter of law on the claims of race and national origin discrimination.

2. Defendant Is Entitled to Summary Judgment As To The Hostile Work Environment Claim.

In addition to prohibiting discrimination, Title VII renders it unlawful for an employer to require an African-American to work in a racially hostile work environment. 42 U.S.C. § 2000e-2(a)(1) (2018); *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986). A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). To prevail on a Title VII claim that a workplace is hostile, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's . . . race [and/or national origin]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which

is imputable to the employer." *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (internal quotation marks and citation omitted).

Defendant contends that "[t]he undisputed evidence establishes that nothing of the kind took place" in the BPD and that "[t]here is no evidence that [Plaintiff] received anything but civil treatment during the investigation into the March 6, 2014 incident." ECF No. 36-1 at 27. To grant Defendant's Motion, the Court need only find that Plaintiff cannot prove at least one element of his claim.

A hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Harris*, 510 U.S. at 22 (citing *Meritor*, 477 U.S. at 67). Whether the environment is objectively hostile is "judged from the perspective of a reasonable person in the plaintiff's position," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and "we look to the totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,'" *Okoli*, 648 F.3d at 220 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998)). Thus, the test is whether a reasonable jury could find that the conduct was severe enough to engender a hostile work environment. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280–81 (4th Cir. 2015). "This is not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22.

According to Plaintiff, he suffered around four incidents over the course of about three years: (1) in early 2011, Sgt. Gaines singled Plaintiff out due to his national origin and rushed him to complete Part I reports on at least two occasions; (2) in July 2011, Sgt. Gaines ordered Plaintiff to return to service when his wife was hospitalized; (3) Sgt. Gaines looked in Plaintiff's direction

and said, "I don't understand these people"; and (4) Sgt. Gaines oversaw the FIT investigation into Plaintiff's conduct on March 6, 2014. ECF No. 2 at 3–4, 6; ECF No. 36-24.

Plaintiff's allegations of hostile work environment as to the first, second, and fourth incidents are simply without merit. On each of these occasions, there is no evidence that the conduct complained of was based on Plaintiff's race or national origin. With regard to the Part I reports, Plaintiff fails to acknowledge that Sgt. Gaines was following BPD policy by requiring that the reports be completed within two hours of completing the call. ECF No. 36-26 at 3 ("Submit Part I crime reports within two hours of the completion of the call, unless extenuating circumstances exist."). As to the July 2011 incident, Plaintiff has put forth no evidence demonstrating that Sgt. Gaines ordered him to return to service based on his race or national origin. And finally, as previously discussed, the investigation into Plaintiff's conduct arose pursuant to BPD policy to investigate all uses of force, not Plaintiff's race or national origin, and Sgt. Gaines played a limited role in the investigation. ECF No. 36-4; ECF No. 36-7 at 3, ¶ 8. Even if Plaintiff had shown that these incidents were based on his race and national origin, his claim as to these incidents fails because the environment was not sufficiently pervasive to alter Plaintiff's employment. The events were infrequent, as they occurred between 2011, when Plaintiff was assigned to the North-East District, and 2014, when the final FIT investigation report was submitted to the Disciplinary Review Committee and the investigation concluded. *See Harris*, 510 U.S. at 23 (noting that frequency of discriminatory conduct is a consideration). These events were also not "psychologically injurious." *Id.* at 22. Rather, they were "normal day-to-day dissatisfactions and annoyances commonly arising in any workplace," which is insufficient for a jury finding of hostile work environment under Title VII. *Settle*, 34 F.Supp.2d at 991.

24

For similar reasons, Plaintiff's allegation as to the third incident is insufficient for a reasonable jury to a make a finding of hostile work environment. As discussed, Sgt. Gaines allegedly made the comment to an "open area" of the North-East District station while officers were congregated after roll call. ECF No. 36-3 at 76–78; ECF No. 36-27 at 2. There is simply no evidence, aside from Plaintiff's interpretation, that the comment was directed at Plaintiff or Plaintiff's race and/or national origin. Even if Plaintiff could prove that it was directed at him, the comment is a "mere utterance of an epithet which engenders offensive feelings in [Plaintiff]," but it "does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (citation and internal quotation marks omitted). Although not raised by Defendant, Plaintiff's allegations in 2011 may also be time-barred. That possibility is not factored into the Court's decision here.

Even considering the facts most favorable to Plaintiff, there is insufficient evidence from which any reasonable jury could find that the incidents complained of were based on Plaintiff's race or national origin or that they were sufficiently severe or pervasive to alter the conditions of Plaintiff's employment. Accordingly, Defendant is entitled to judgment as a matter of law on the claim of hostile work environment.

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court finds that, in the light most favorable to Plaintiff, there is insufficient evidence from which a jury could find in Plaintiff's favor on his discrimination and hostile work environment claims. Plaintiff has failed at each and every turn to prove any discriminatory motive. There is no nexus between any allegation and any alleged adverse employment action. Every action taken by Defendant was in response to Plaintiff's failure to comply with the policies and procedures of the Baltimore City Police

Department. Therefore, Defendant's Motion (ECF No. 36) is GRANTED, and Plaintiff's Motion for Leave (ECF No. 57) and Defendant's Motion to Strike (ECF No. 58) are DISMISSED as MOOT. A separate order will follow.

Date: 5 February 2019

A. David Copperthite
United States Magistrate Judge